IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MERCY AMBAT, et al., | No. C 07-03622 SI |
| Plaintiffs, | **ORDER RE: SUMMARY JUDGMENT MOTIONS** |
| v. | |
| CITY AND COUNTY OF SAN FRANCISCO, | |
| Defendant. / | |

On February 12, 2010, the Court heard oral argument on the parties' cross-motions for summary judgment. Having considered the arguments of the parties and the papers submitted, and for good cause shown, the Court hereby GRANTS in part defendant's motion for summary judgment, DENIES plaintiffs' motion, and DENIES plaintiff Jon Gray's motion.

## BACKGROUND

These consolidated cases involve challenges by approximately thirty sheriff's deputies to a gender-based staffing policy of the San Francisco Sheriff's Department. In mid-2006, the Sheriff reorganized inmate housing in the San Francisco jails such that all female inmates were placed in County Jail #8 in female-only housing units, or "pods." Thereafter, in October 2006, the Sheriff implemented a policy requiring that only female deputies be assigned to staff these female pods. Plaintiffs in this case are both male and female sheriff's deputies who allege that the Sheriff's staffing policy ("the Policy") amounts to employment discrimination. In their Third Amended Complaint ("TAC"), plaintiffs assert nine causes of action: (1-2) gender discrimination under Title VII and California's Fair Employment and Housing Act ("FEHA"); (3) "gender employment restrictions" under

Title VII; (4) "advertisement for gender discrimination" under FEHA; (5-6) retaliation under Title VII and FEHA; (7) failure to prevent violations of FEHA; (8) violations of California's "Whistleblower" Statute; and (9) violations of California's Peace Officers' Bill of Rights.

Presently before the Court are three cross-motions for summary judgment. Defendant moves for summary judgment on each of the nine causes of action. Plaintiffs move for summary judgment on the First, Second, Third, Fourth, and Seventh Causes of Action, and plaintiff Jon Gray moves for summary judgment on the retaliation claims asserted by him and a handful of other plaintiffs.

In granting the majority of defendant's summary judgment motion, the Court wishes to emphasize that its ruling is limited to the facts of the present case. An employer's decision to use gender as the basis for work assignments is outside modern-day norms and presents significant questions regarding the circumstances under which Title VII and FEHA permit gender-based classifications. However, although the courts are responsible for determining whether a particular gender-based staffing policy runs afoul of anti-discrimination statutes, *E.E.O.C. v. Boeing Co.*, 843 F.2d 1213, 1217 (9th Cir. 1988), courts must exercise "judicial restraint" when assessing the decisions of correctional officials due to the expertise of such officials, their "ability . . . to plan and muster resources, the primary nature of the executive – as opposed to the judicial – branch of government to run the prisons, and the respect owed to state sovereignty by the federal judiciary." *Everson v. Mich. Dep't of Corr.*, 391 F.3d 737, 752 (6th Cir. 2004). Accordingly, the Court's decision today does not amount to an endorsement of the policy implemented by the San Francisco Sheriff's Department, or a statement that the Court would make the same policy decision if placed in the Sheriff's position. The Court concludes only that, under the circumstances of this case, the Sheriff's decision was lawful.

### LEGAL STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no

burden to disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only demonstrate that there is an absence of evidence to support the non-moving party's case. *Id.* at 325. The burden then shifts to the non-moving party to "set out 'specific facts showing a genuine issue for trial.'" *Id*. at 324 (quoting Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In deciding a summary judgment motion, the evidence is viewed in the light most favorable to the non-moving party, and all justifiable inferences are to be drawn in its favor. *Id*. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Id.* However, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

**DISCUSSION**

**I.** **First and Second Causes of Action: Gender Discrimination under Title VII and FEHA**

Plaintiffs' First and Second Causes of Action allege that the Policy constitutes gender discrimination under state and federal law. First, plaintiffs allege that they have suffered injury as a result of a change in the shift-bid system. According to plaintiffs, when the Policy was implemented, the Sheriff's Department began making assignments for shifts and days off according to gender rather than seniority. TAC ¶ 39. Both the male and female plaintiffs allege that they have received less favorable assignments than they would have under the seniority-based system. The male plaintiffs further allege that they have lost overtime shifts in the female pods to female deputies with less seniority, that they have lost promotional opportunities as a result of a lack of opportunity to supervise female inmates, and that they are forced to "trade" to shifts in unfamiliar facilities when a female deputy

3

in one of those facilities is needed to staff a shift in a female pod. *Id.* ¶¶ 37-41, 108.

Second, the female plaintiffs separately allege that they are placed at increased stress and risk of harm as a result of the Policy. According to plaintiffs, this is because female inmates are not segregated by security level, history of violence, or mental health status, because lights are not kept on 24 hours a day as they are in male housing units, and because the female pods are overcrowded and understaffed, with only one female deputy on duty at certain times. TAC ¶ 25-28, 31. The female plaintiffs further allege that they lack adequate training in the security procedures needed to deal with the female inmate population, and that the female pods lack infrastructure for security enforcement, such as leg and body chains to be used in transporting dangerous inmates. *Id.* ¶¶ 30, 32.

Title VII and FEHA make it unlawful for an employer to discriminate on the basis of sex with respect to an employee's compensation or in the terms, conditions, or privileges of employment, or to "limit, segregate, or classify" on the basis of sex in any way that deprives employees of employment opportunities or adversely affects their employment status. 42 U.S.C. § 2000e-2(a)(1) & (2); Cal. Gov. Code § 12940(a). Where, as here, an employer's policy differentiates between male and female employees on its face, the employer bears the burden of demonstrating a defense to liability. *Frank v. United Airlines, Inc.*, 216 F.3d 845, 853 (9th Cir. 2000).

A statutory defense to liability under both Title VII and FEHA exists when sex is a bona fide occupational qualification ("BFOQ") that is "reasonably necessary to the normal operation of that particular business or enterprise." 42 U.S.C. § 2000e-2(e); Cal. Gov. Code § 12940.[1] The BFOQ defense is available only under limited circumstances. First, the employer must show that the "essence" or "central mission" of its business would be undermined if the employer did not impose the qualification. *Int'l Union, United Automobile, Aerospace & Agric. Implement Workers of Am., UAW v. Johnson Controls*, 499 U.S. 187, 202-03 (1991); *Dothard v. Rawlinson*, 433 U.S. 321, 333 (1977). In the correctional context, the "essence" of the business includes "the security of the prison, the safety of inmates, and the protection of the privacy rights of inmates." *Everson*, 391 F.3d at 753. Second, the

---

[1] The same analysis applies to both Title VII and FEHA claims. "Because California law under the FEHA mirrors federal law under Title VII, federal cases are instructive." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1219 (9th Cir. 1998).

4

employer must demonstrate that the qualification actually relates to an employee's ability to do the job and is reasonably necessary – not "merely reasonable or convenient" – to ensure continued operation of the business. *Id.* at 748.[2] Finally, the employer must show that the interests advanced by the challenged policy could not be achieved through any reasonable alternative policy. *Everson*, 391 F.3d at 749; *Robino v. Iranon*, 145 F.3d 1109, 1111 (9th Cir. 1998).

### A. Essence of the Business

Defendant has shown to the Court's satisfaction that the Policy was implemented to protect interests that amount to the "essence" of the Sheriff's business, including security of the jail, safety, privacy, and rehabilitation of female inmates, and efficiency and morale among deputies. Defendant identifies several key problems that, in its view, justified the imposition of Policy. The most significant of these relate to sexual misconduct, deputy morale, security violations, and privacy concerns.

First and foremost, defendant states that the Policy was implemented to prevent sexual misconduct and other inappropriate relationships between male deputies and female inmates. The Sheriff's Department investigated twelve complaints of sexual misconduct between 2001 and 2006, four of which occurred in 2005, the year before the Policy was implemented. *See* Flewellen Decl. ¶ 16.[3] The allegations included all levels of misconduct, from inappropriate conversation to sexual intercourse. *Id.* ¶¶ 4-15; Ex. A-L. Some of these allegations were ultimately not sustained, others resulted in the deputy receiving discipline, and some resulted in the deputy resigning. *Id.* In one case, the Sheriff referred the complaint to the District Attorney for prosecution. Hennessey Decl. ¶ 9. In addition, within the same time period, female inmates filed two federal lawsuits alleging civil rights violations as a result

---

[2] The employer may prove reasonable necessity by showing that there is a substantial basis to believe that all or nearly all employees with the affected characteristic lack the ability to perform required job functions safely and effectively. *See Dothard*, 433 U.S. at 333. However, this is but one possible "formulation" of the reasonable necessity test, and "may or may not assist a court in evaluating the facts of the particular case before it." *Id.*; *Everson*, 391 F.3d at 748 n.15. Accordingly, the Court will consider this standard to the extent it is helpful and relevant.

[3] Plaintiffs' evidentiary objections to this declaration are without merit and are overruled.

5

of sexual abuse by male deputies. *See* Def. Ex. A & B.[4]

Plaintiffs attempt to undermine the importance of this justification by pointing to deposition testimony in which the Sheriff stated that incidents of sexual violence were "isolated" and that only a few incidents formed the "trigger" for the Policy. *See* Hennessey Depo., Pltf. Ex. E, at 189:21-190:15, 215:22-216:25. Plaintiffs argue that such isolated or "anecdotal, unproven, unprosecuted, and uncorroborated allegations of misconduct" cannot provide support for the Policy. However, the Sheriff's use of the term "isolated" during his deposition does not erase the objective evidence showing a history of misconduct allegations in the San Francisco jails. In the Court's view, prevention of misconduct is a legitimate concern related to the essence of the Sheriff's business.

Second, defendant asserts that the Sheriff implemented the Policy to address security and morale problems created by the atmosphere of misconduct allegations. According to Sheriff Hennessey and Undersheriff Dempsey, male deputies have been reluctant to supervise female inmates closely due to a fear of false misconduct allegations, creating opportunities for smuggling and use of contraband,[5] and leading to morale problems due to female deputy partners of these male deputies feeling overburdened. Hennessey Decl. ¶ 12; Dempsey Decl. ¶¶ 22-23.[6] Several plaintiffs echoed these explanations during their depositions. *See* Gray Depo., Def. Ex. T, at 127:18-128:6 (female inmates have accused him of "making a pass" on six occasions); Jones Depo., Def. Ex. Y, at 78:6-8 (was "concerned about being accused of sexual misconduct"); Keeton Depo., Def. Ex. AA, at 32:19-23 (sometimes felt she was "carrying all the weight" when working with a male partner in a female pod), 31:10-16 (worked with male partners who did not "want[] to go out and be part of the female area because . . . they are afraid that a female might say something about them"); Flynn Depo., Def. Ex. R, at 93:16-95:14 (many female deputies, including the deponent herself, felt they ended up doing more work when assigned to a female

---

[4] The Court grants defendant's request for judicial notice of the complaints in these suits.

[5] A very recent Ninth Circuit decision dealing with the issue of mandatory strip-searches in San Francisco jails found that the presence of contraband articles presents a "serious, ongoing problem" in these facilities. *See Bull v. City & County of San Francisco*, No. 05-17080, Slip Op. at 2244 (9th Cir. Feb. 9, 2010).

[6] The Court overrules plaintiffs' objections to the Hennessey and Dempsey Declarations.

6

pod with a male partner). In the Court's view, male deputies' fear of misconduct allegations, standing alone, would not present a legitimate justification for the policy. The fact that the fear gives rise to real security and workplace morale considerations, however, does present a valid concern. Indeed, the legitimacy of security considerations implicated by deputies' fear of false allegations has been affirmed by other courts. *See Everson*, 391 F.3d at 753-54 (observing that "many male officers, afraid of false accusations of sexual abuse, become 'gun-shy' and fail to monitor and discipline inmates in a proactive fashion").

Third, defendant asserts that the Policy was designed to protect the privacy interests of female inmates. The parties agree that the female pods are equipped with privacy screens that partially cover an inmate while she is showering or using the toilet.[7] However, defendant presents evidence that female inmates must change clothes twice a day in their sleeping areas, in plain view of deputies. *See* Dempsey Decl. ¶¶ 12, 27. Although inmates' privacy rights are reduced, "a person's interest in not being viewed unclothed by members of the opposite sex survives incarceration." *Robino*, 145 F.3d at 1111.[8] Plaintiffs do not attempt to controvert this evidence, except to cite to a portion of Undersheriff Dempsey's deposition in which she stated that "in a perfect world" a male deputy staffing a female pod would never be able to view female inmates unclothed. Dempsey Depo., Pltf. Ex. F, at 151:21-152:4. In the Court's view, defendant has shown that legitimate privacy concerns remain; these concerns plainly relate to the essence of defendant's business.

In sum, all of the aforementioned considerations, including safety, security, privacy, and morale, plainly go to the "essence" of running a correctional facility. *See Everson*, 391 F.3d at 753.

---

[7] The parties dispute whether female inmates' faces are screened while they are using the toilet, but this does not amount to a material factual dispute.

[8] In addition, although jail rules require female inmates to remain fully clothed except while showering or changing, female inmates sometimes violate this rule. *See* Dempsey Decl. ¶ 27; Dempsey Depo., Pltf. Ex. F, at 150:11-16 ("[W]omen have been disrobed and walking around the pod . . . in times I've been at the pod."); Versher Depo., Def. Ex. RR, at 100:8-13 (prior to the policy change, female inmates would sometimes "come out to try to parade themselves [half-dressed] around in the pod area in front of a male deputy"). Although plaintiffs correctly assert that such intentional acts by female inmates cannot logically give rise to privacy considerations, these intentional acts may still work to undermine male deputies' authority.

7

### B. Remaining Factors

The Court must next assess whether the female-only staffing policy was "reasonably necessary" to address the issues identified by the Sheriff and to ensure the "normal operation" of the jails. *See* 42 U.S.C. § 2000e-2(e). In the Court's view, an inquiry into whether the Policy was reasonably necessary is inextricably linked to the thoroughness of the Sheriff's decision-making process and his consideration of non-discriminatory alternatives.

#### 1. Deference

The Court must accord deference to a correctional officer's ultimate policy judgment if it is "the product of a reasoned decision-making process, based on available information and experience." *Torres v. Wis. Dep't of Health & Soc. Servs.*, 859 F.2d 1523, 1532 (7th Cir. 1988) (en banc). Plaintiffs assert that defendant cannot establish the Policy was the product of a reasoned decision-making process because the Sheriff "never proactively surveyed inmates, deputies, or conducted any analysis or research into determining the legitimacy or extent of the prevalence of inappropriate relationships either prior to, or after, enactment of the Policy." Pltf. Oppo. at 11. Defendant does not contest the fact that the Sheriff conducted no specific studies, research, or consultation with inmates or line staff prior to implementing the Policy. Rather, defendant asserts that the Sheriff's decision is entitled to significant deference based on his own 30-year experience as a correctional official as well as his consultation with senior staff.

Relevant caselaw provides support for plaintiffs' contention that courts often look to studies or consultation conducted by the employer in assessing the level of deference to grant to an employer's discriminatory policy decision. *See Robino*, 145 F.3d at 1111 (corrections department "conducted an extensive survey of post duties before determining which posts should be designated female-only"); *Everson*, 391 F.3d at 741-47, 751-52 (correctional official commissioned studies, incorporated terms of settlements with two civil rights plaintiffs, and consulted with own staff as well as prison officials from other states). However, the Court's research uncovered no case holding that a correctional official *must* undertake a particular type of study or consultation prior to designing a policy to address a pressing

8

problem.[9] The cases cited by defendant instruct that although a correctional official's policy decision may be entitled to somewhat less deference when it did not result from a thorough evaluation, the official may still show that the policy is reasonably necessary by pointing to the official's own common-sense conclusions as well as expert testimony and other post-hoc evidence. *See Dothard*, 433 U.S. at 335 (relying on expert testimony rather than objective evidence to find BFOQ); *Healey v. Southwood Psychiatric Hosp.*, 78 F.3d 128, 132 (3d Cir. 1996) (employer's "appraisals need not be based on objective, empirical evidence, and common sense and deference to experts in the field may be used."); *Torres*, 859 F.2d at 1532 (employers' "efforts ought to be evaluated on the basis of the totality of the circumstances as contained in the entire record").

Defendant offers declarations from both Sheriff Hennessey and Undersheriff Dempsey attesting to the development of the Policy. Sheriff Hennessey states in his declaration that his duties as Sheriff, a post he has held for thirty years, include: visiting every jail facility to speak with staff and inmates; holding monthly senior staff meetings to receive reports on the operations of each facility; conferring "regularly" with Undersheriff Dempsey until her retirement in 2009; holding disciplinary hearings; meeting with other California sheriffs; and attending or speaking at conferences on developments in corrections. Hennessey Decl. ¶¶ 4-5. The Sheriff avers that the Policy was designed based on the knowledge gained from these duties as well as several months of targeted discussions with Undersheriff Dempsey, the Chief of Custody, and commanders from each of the jail facilities. *Id.* ¶ 7. Sheriff Hennessey states that the primary impetus for the Policy was the prevention of sexual misconduct, which he describes as "one of the most fundamental obligations of correctional officials." *Id.* ¶ 11. The Sheriff states that he also considered the other factors discussed earlier in this order, including security and morale concerns related to male officers' fear of misconduct allegations, as well as female inmates' privacy and rehabilitation. *Id.* ¶¶ 12-15.

In her declaration, Undersheriff Dempsey echoes the justifications given by Sheriff Hennessey and confirms that the Policy was enacted after several months of consideration by the Sheriff,

---

[9] In addition, corrections officials are not required to build consensus among their staff before implementing a policy change. *See Everson*, 391 F.3d at 752 ("A prison official need not run his department as a participatory democracy nor build 'unanimity of opinion' to win deference.").

Undersheriff, and other senior staff. Dempsey Decl. ¶¶ 22-29. Significantly, Undersheriff Dempsey also states that, prior to implementing the Policy, the Sheriff's Department notified the Union of its intention; the Union initially filed a grievance for failure to meet and confer but dropped the grievance before the City ever responded. *Id.* ¶ 67.

Based on these declarations, the Court concludes that the Sheriff's decision is entitled to some level of deference. It is worth emphasizing that the Court is not charged with determining whether the Policy was the *best* means of addressing the problems the Sheriff and Undersheriff were seeking to remedy. Rather, the Court's task is limited to determining whether the Sheriff's actions were lawful. It is certainly true that the Sheriff could have engaged consultants and experts, consulted with directors of other corrections institutes, or conducted extensive interviews with line staff and inmates before implementing the Policy. In the Court's view, however, the Sheriff's and Undersheriff's expertise should not be discounted, nor should the importance of responding in a timely fashion to documented and observed problems. Moreover, "[a]dditional reasons counsel in favor of a policy of judicial restraint: the ability of administrators to plan and muster resources, the primary nature of the executive – as opposed to the judicial – branch of government to run the prisons, and the respect owed to state sovereignty by the federal judiciary." *Everson*, 391 F.3d at 752.

In addition, the Court has remained mindful of the limited number of shifts affected by the Policy. The parties agree in their briefing that a maximum of 26 out of 300 to 400 daily shifts within the Sheriff's Department are designated female-only. The parties stated at oral argument that the Sheriff's Department employs approximately 120 to 160 female deputies out of a total of 800 to 900.[10] The fact that so few of the available daily positions are impacted leads the Court to apply a greater degree of deference to the Sheriff's decision than if the Policy had effected a complete overhaul of the entire Department.

---

[10] Plaintiffs' counsel stated at argument that the female inmate population in the San Francisco jails ranges between 50 and 110. The Sheriff's Department website states that the total daily inmate population in the jails is approximately 2,200. *See* San Francisco Sheriff's Department, "Jails," http://www.sfsheriff.com/jails.htm.

10

### 2. **Reasonable Necessity**

Having determined that the Sheriff's decision is entitled to deference, the Court must next determine whether defendant has shown that the Policy was reasonably necessary to ensure the normal operation of the jails. Plaintiffs contend that the Policy was not reasonably necessary for a number of reasons, each of which the Court will address in turn. First, plaintiffs assert the Policy was unnecessary because misconduct cannot possibly take place in a circular-structured jail.[11] Plaintiffs themselves point out, however, that past instances of misconduct in the circular-structured jails occurred when a male deputy took a female inmate *outside* the pod area. *See* Def. Ex. A at 3-4 (alleging that male deputy took female inmate to a storage closet, kissed her on the mouth, and forced her to perform oral sex on him). Implementing a policy preventing male deputies from having daily control over female inmates is a solution directed at solving this problem. In addition, defense counsel made clear at oral argument that the Sheriff was also concerned that the "direct supervision" structure of the circular jail would permit the development of intimate relationships that do not yet rise to the level of sexual but are nonetheless improper under Sheriff's Department policy. Although the occurrence of such relationships would be all but impossible to document, the Court has no doubt that this is a legitimate concern.

Next, plaintiffs assert the Policy was not reasonably necessary to address the security concerns associated with male deputies' fear of false misconduct allegations because "female inmates are much more likely to obey orders and directions from male deputies who tend to cultivate a sense of calmness among the female inmates." Pltf. Oppo. at 4. Courts are expressly cautioned against infecting the BFOQ analysis with "stereotypic impressions of male and female roles," *Fernandez v. Wynn Oil Co.*, 653 F.2d 1273, 1276 (9th Cir. 1981), and the Court accords no weight to this assertion.[12]

Plaintiffs further assert that the Policy does not reasonably address the stated concerns resulting

---

[11] In contrast to traditional or "linear" jails in which the cells are arranged in rows with a corridor in the middle, pods are arranged in a circular fashion with the cells bordering a central area with a podium for the deputies. Dempsey Decl. ¶¶ 6-7.

[12] Similarly, the Court rejects plaintiffs' conclusory assertion that male deputies are necessary to ensure security because their "greater upper body strength" is "an effective tool in quickly ending altercations." Plaintiffs provide no support for this claim other than their own observations, and the Supreme Court has "refused to allow employers to use sex as a proxy for strength although it might be a fairly accurate one." *Johnson Controls*, 499 U.S. at 202. In addition, the Court does not believe that Title VII was intended to encompass such a claim.

11

from male deputies' reluctance to supervise female inmates because "any morale problem resulting from a male Deputy that was not 'pulling his weight' in completing his assigned tasks in the Pod, would and should be handled as a training issue." Pltf. Oppo. at 4-5. In support of this assertion, plaintiffs cite a portion of Undersheriff Dempsey's deposition in which she stated that a supervisor "should take action" if informed by a deputy that her partner was shirking certain duties. Dempsey Depo., Pltf. Ex. F, at 191:21-24. Plaintiffs may well be correct that training and supervisor instruction would help address any reluctance on the part of male deputies to supervise female inmates closely. However, Undersheriff Dempsey's deposition also makes clear that even those female plaintiffs who stated their male partners sometimes shirked their duties did not report these violations to senior staff. *Id.* at 192:5-7 ("I don't have any specific recollection of such a complaint being made to me, that I'm aware of."). Accordingly, the Sheriff reasonably concluded that the Policy was necessary to address the security and morale problems associated with staffing male deputies in female housing units.

The Court is satisfied that the Sheriff responded in a reasonably necessary manner to the specific problems he identified after consultation with senior Sheriff's Department staff.

### C. Reasonable Alternatives

Finally, the Court must assess whether defendant has shown that no feasible, non-discriminatory alternatives could have furthered its objectives. The Sheriff has specifically rejected three possible alternatives to the Policy. First, he concluded that "there was no effective testing or screening method" to identify deputies who might engage in sexual misconduct. Hennessey Decl. ¶ 16. Second, he found that installing additional security cameras in the female pods would be cost-prohibitive. *Id.* Third, he considered offering additional training regarding sexual harassment and misconduct, but concluded that as all deputies already know that personal relationships of any nature between deputies and inmates are forbidden, additional training would prove ineffective at eliminating the problem. *Id.*

It is true that the Sheriff did not specifically identify and reject *all* possible alternatives to the Policy. However, no additional feasible alternatives have been identified. Plaintiffs suggest that the Sheriff could have increased deputies' training regarding sexual misconduct, installed rotating cameras to provide more coverage of the female pod areas, and "improved security by installing adequate

12

hardware for lock up and slots on doors for safety restraining inmates and providing ad-seg inmates food trays." Pltf. MSJ at 9.

Even leaving aside the issue of cost, plaintiffs' suggestions regarding cameras and other security apparatus are unavailing. First, with respect to cameras, plaintiffs' suggestion ignores a fact plaintiffs themselves have previously stressed – that instances of sexual misconduct tend to take place outside the pods, for example in storage areas. Cameras that sweep the pods would not address the problem of sexual abuse. In addition, cameras could not solve the problems related to privacy, contraband detection, morale, and rehabilitation. Second, with respect to other security hardware, plaintiffs' suggestions that the Sheriff bulk up cell doors and install inmate restraints seem to bear no relation to the security risks identified by defendant.

Plaintiffs' training suggestion is similarly unpersuasive. The Sheriff has stated that, in his view, additional training would not eliminate sexual abuse by male deputies. In the Court's view, this conclusion is both well-reasoned and consistent with common sense. Indeed, plaintiffs' own expert testified at his deposition that it was "correct" that training would "not prevent and not discourage all staff from engaging in sexual misconduct." Marquart Depo., Def. Ex. FF, at 90:6-9.[13] The Court does not wish to substitute its judgment for that of jail administrators by offering other potential solutions.

In sum, the Court finds that defendant has met its burden of proof with respect to each element of the BFOQ defense. Defendant has shown to the Court's satisfaction that the Policy goes to the "essence" of its operations, including safety, security, privacy, and rehabilitation; that the Policy is reasonably necessary to advance these interests; and that no feasible alternative policy exists. Accordingly, the Court GRANTS defendant's motion for summary judgment on the First and Second Causes of Action and DENIES plaintiffs' cross-motion.

Although the Court does not reach the merits of plaintiffs' Title VII and FEHA claims because it concludes that defendant has established that it is entitled to a BFOQ defense, defendant has raised some persuasive arguments regarding the *de minimis* nature of many of the harms alleged in this case. For example, as mentioned previously in this order, the Policy affects only 26 out of the 300 to 400 daily

---

[13] Plaintiffs object to this evidence, but offer no legitimate justification for excluding the relevant testimony of their own expert. Plaintiffs' objection is overruled.

13

shifts distributed among the Sheriff's Department's 150 female and 650 to 750 male deputies. The sheer number of unaffected shifts casts doubt on the male plaintiffs' claims that they have lost significant promotional and overtime opportunities as a result of the Policy. In addition, the fact that there are significantly more female deputies than female-designated shifts undermines the female plaintiffs' claim that they have been confined to the female pods as a result of the Policy. Indeed, many of the female plaintiffs' own depositions admit this fact. *See, e.g.*, Kincade Depo., Def. Ex. BB, at 32:11-25 (detailed to female pods four times in 2009 and "over ten" times in 2008); Janssen Depo., Def. Ex. X, at 25:11-19 (assignments to female pods "sporadic," up to "several times a month"); Flynn Depo., Def. Ex. R, at 33:20-34:3 (assigned to female pods for evening shift approximately twice a week); *see also* Crotty Depo., Def. Ex. N, at 27:2-15 (granted transfer out of position in female pods); Thomas Depo., Def. Ex. QQ, at 57:14-23 (same). Finally, many of the claims advanced by plaintiffs, including the claims regarding the danger and difficulty of supervising female inmates, do not appear to be actionable as Title VII or FEHA violations. In the Court's view, these are challenges to plaintiffs' workplace conditions that are better addressed through plaintiffs' union grievance processes than through a gender discrimination suit in federal court.

## II. Third, Fourth, and Seventh Causes of Action

Plaintiffs' Third and Fourth Causes of Action pertain to postings for female-only shifts at County Jail 8. Plaintiffs' Seventh Cause of Action alleges failure to prevent discrimination under FEHA, as well as failure to prevent retaliation toward plaintiff Gray. The Court has already found that the Policy itself does not give rise to Title VII or FEHA liability, and concludes later in this order that plaintiff Gray cannot state a retaliation claim. Therefore, there is no basis for plaintiffs' claims for "gender employment restriction," "advertisement for gender discrimination," or failure to prevent discrimination and retaliation. The Court therefore GRANTS defendant's motion for summary judgment on the Third, Fourth, and Seventh Causes of Action and DENIES plaintiffs' and Gray's motions for summary judgment on these claims.

**United States District Court**
For the Northern District of California

**III.     Fifth and Sixth Causes of Action: Retaliation (Plaintiffs Anderson, Janssen, and Gray)**

In the Fifth and Sixth Causes of Action, plaintiffs Anderson, Janssen, and Gray claim the Department retaliated against them for complaining about the Policy.[14] Defendant moves for summary judgment on these claims, and plaintiff Gray has filed a separate cross-motion for summary judgment.

**A.     Exhaustion (Plaintiff Anderson)**

First, defendant asserts that the Court must dismiss plaintiff Anderson's retaliation claims because she did not exhaust her administrative remedies. Anderson filed a charge with the California Department of Fair Employment and Housing ("DFEH") in November 2006 and an additional charge with the EEOC in March 2007. *See* Def. Ex. H. In these charges, Anderson described the Policy and the basis of her contentions of sex discrimination, but did not mention any of the retaliatory acts of which she now complains.

To establish federal subject matter jurisdiction over her retaliation claims, plaintiff must demonstrate that she filed timely charges with the EEOC or DFEH. *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1099 (9th Cir. 2002). "[W]hen an employee seeks judicial relief for claims not listed in the original EEOC charge, the complaint nevertheless may encompass any discrimination like or reasonably related to the allegations of the EEOC charge." *Freeman v. Oakland Unified Sch. Dist.*, 291 F.3d 632, 636 (9th Cir. 2002). Under this rule, "jurisdiction extends over all allegations of discrimination that either fell within the scope of the EEOC's *actual* investigation or an EEOC investigation which *can reasonably be expected* to grow out of the charge of discrimination." *B.K.B.*, 276 F.3d at 1100 (original emphasis) (internal quotation marks and citation omitted).

Plaintiff Anderson complains of five allegedly retaliatory acts by defendant: (1) a negative performance evaluation issued by Lt. Minor; (2) intimidation by Sgt. Wallace and Capt. Pecot; (3) denial of a request for FMLA leave to care for her sick child; (4) denial of a request for a 30-day extension of

---

[14] Plaintiffs Spires-Morgan and Versher also asserted retaliation claims in the complaint, but these plaintiffs have abandoned their claims by failing to raise them in opposition to defendant's summary judgment motion. *Jenkins v. County of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005). Plaintiffs Janssen, Spires-Morgan and Versher's Whistleblower claim (Eighth Cause of Action) and plaintiff Versher's POBR claim (Ninth Cause of Action) have also been abandoned.

15

her current position on the midnight shift; and (5) denial of two subsequent requests for transfers to a different facility. Anderson's first, second, third and fourth retaliation claims – related to the negative performance evaluation, acts of intimidation, and denials of requests for leave and extension – all pertain to acts that took place before the EEOC charge was filed in March 2007. *See* Anderson Decl. ISO Pltf. MSJ (Docket No. 38) ("Anderson I") ¶ 46; Anderson Decl. ISO Pltf. Oppo. (Docket No. 220) ("Anderson II") ¶¶ 4-7. Where an EEOC charge fails to include any mention of retaliatory acts that have already occurred, "the agency [is] not on notice to investigate . . . [these] instances of past retaliation" and the claims must be dismissed for failure to exhaust. *Curry v. Shinseki*, No. 08-16380, 2009 WL 4884329, at * 1 (9th Cir. Dec. 14, 2009). Anderson's first through fourth retaliation claims are therefore DISMISSED for lack of jurisdiction.

Anderson's fifth retaliation claim alleges that the Sheriff denied two transfer requests. Anderson does not state the dates of the requests or the dates on which they were denied. Even assuming this claim was exhausted, however, the claim fails on its merits for the reasons set forth below.

### B. Merits of Retaliation Claims

Second, defendant challenges the merits of each of the retaliation plaintiffs' claims. In retaliation cases, the Court applies the familiar three-step burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The first step requires the plaintiff to make out a prima facie case of retaliation by showing "(1) involvement in protected activity opposing an unlawful employment practice, (2) an adverse employment action, and (3) a causal link between the protected activity and the adverse action." *Freitag v. Ayers*, 468 F.3d 528, 541 (9th Cir. 2006). The burden then shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse action. *McDonnell Douglas*, 411 U.S. at 802. Finally, the burden shifts back to the plaintiff to show that the employer's proffered explanation is merely a pretext for a retaliatory motive. *Id.* at 804. Defendant contends that plaintiffs' claims must fail because they either cannot articulate a prima facie case of retaliation or cannot show that defendant acted with a retaliatory motive.

### 1. Plaintiff Anderson

Plaintiff Anderson claims defendant retaliated against her by denying two requests to be transferred out of the female pods at County Jail #8. Anderson II ¶ 8. Even assuming plaintiff has made out a prima facie case of retaliation, her claim fails. Defendant presents evidence that Anderson's transfer requests would have been granted were it not for the fact that she has been on leave for at least the past year. Dempsey Decl. ¶ 39. This amounts to a legitimate non-retaliatory reason for the denial of Anderson's requests, and plaintiffs make no effort to show that defendant's justification is mere pretext for retaliation. Accordingly, Anderson's claim fails and defendant's motion for summary judgment is GRANTED.

### 2. Plaintiff Janssen

Plaintiff Janssen contends that defendant retaliated against her by reprimanding her for complaining that the Policy constituted gender discrimination. The essence of Janssen's claim is that after she complained to her superior, Lt. Tilton, about being detailed to a post in a female pod, Lt. Tilton initiated a reprimand investigation with Chief Arata during which he falsely stated that Janssen had spoken to him in an inappropriately "loud an unruly manner." According to Janssen, Chief Arata told her that deputies "are not allowed to question or complain about orders even if the orders are discriminatory," and ultimately entered a written reprimand in Janssen's file which stated that she would be subject to further discipline if she made any further complaints. Defendant does not challenge plaintiff Janssen's ability to make out a prima facie of retaliation, but states only that Janssen's claim must fail because she "cannot prove that [s]he received the reprimand due to retaliatory motive." Def. MSJ at 34. As plaintiffs correctly point out, the burden does not shift back to plaintiffs to prove pretext unless defendant can articulate a legitimate non-retaliatory reason for its actions. In its summary judgment motion, defendant does no more than assert in a completely conclusory fashion that Chief Arata reprimanded Janssen because "the Department had the testimony about Janssen's misconduct, and she has no basis for believing that Sgt. Wallace lied for any retaliatory purpose." Def. MSJ at 34.

Although plaintiff Janssen may well be entitled to go forward with her retaliation claim, the Court is reluctant to rule on the claim on the basis of the present record. In particular, neither party has

provided the Court with the portion of Janssen's deposition during which she was questioned about the reprimand, although both parties cite to the deposition. In addition, the Court has not been provided with any statements from Lt. Tilton or Chief Arata other than a brief and uninformative snippet of Arata's deposition.[15] Accordingly, the Court DEFERS its ruling on plaintiff Janssen's retaliation claim pending the following:

Defendant shall augment the record with additional evidence related to plaintiff Janssen's retaliation claim, including but not limited to the relevant excerpts of Janssen's deposition, no later than **March 5, 2010.** Plaintiffs shall have **ten days from the date of defendant's submission** to file any additional evidence. The Court will take the matter under submission.

### 3. Plaintiff Gray

Defendant also seeks summary judgment on plaintiff Gray's retaliation claim, which is premised on Gray's termination from the Sheriff's Department two years after he joined the present lawsuit challenging the Policy. Gray has filed a separate cross-motion for summary judgment on these claims. The Court agrees with defendant that, even assuming Gray can make out a prima facie case of retaliation, his claim fails because defendant has articulated a non-retaliatory reason that Gray makes no attempt to rebut. The Sheriff states that he terminated Gray as a result of statements Gray made to the National Academy of Arbitrators to the effect that the Sheriff was influenced by financial contributions and nepotism and that James Harrigan, the Sheriff's General Counsel, had engaged in sex tourism. *See* Hennessey Decl. ¶ 17; *see also* Termination Notice, ex. A to Hennessey Decl.

Gray contends these allegations cannot form a legitimate basis for termination because they are protected by California's statutory privilege for statements made in connection with judicial and quasi-judicial proceedings. *See* Cal. Civil Code § 47. As this Court previously held in an order compelling Gray to appear for deposition, Section 47 prohibits the use of such statements as a basis for civil liability for certain torts, including defamation, but does not impose any limitation on evidentiary use of such

---

[15] Defendant contends in its reply brief that Captain Pecot's declaration establishes a legitimate non-retaliatory reason for Janssen's reprimand. However, the cited portions of Pecot's declaration refer to a disciplinary action against plaintiff Spires-Morgan. The declaration does not even mention plaintiff Janssen.

18

statements, much less prohibit adverse employment actions based on such statements. *See Oren Royal Oaks Venture v. Greenberg, Bernhard, Weiss & Karma, Inc.*, 728 P.2d 1202, 1208 (Cal. 1986); *Cabral v. Martins*, 99 Cal. Rptr. 3d 394, 406 (Cal. Ct. App. 2009). Because Gray does not even attempt to rebut the non-retaliatory justification offered by defendant, defendant's motion for summary judgment on Gray's retaliation claims is GRANTED and Gray's cross-motion is DENIED.

### IV.     Miscellaneous Motions

Defendant's motion to strike plaintiffs' expert declarations is denied. Defendant's objections to specific portions of the declarations were noted, and the Court did not rely on those portions of the declarations in reaching its decision. Defendant's request for judicial notice is granted.

### CONCLUSION

For the foregoing reasons and for good cause shown, defendant's motion for summary judgment is GRANTED in part, plaintiffs' motion is DENIED, and plaintiff Gray's motion is DENIED. (Docket Nos. 177, 192, 201). Defendant shall augment the record in relation to plaintiff Janssen's retaliation claim no later than **March 1, 2010,** and plaintiffs shall respond within **seven days from the date of defendant's submission**.

**IT IS SO ORDERED.**

Dated: February 17, 2010

SUSAN ILLSTON
United States District Judge