IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MERCY AMBAT, et al., | No. C 07-03622 SI |
| Plaintiffs, | **ORDER DENYING PLAINTIFFS' MOTION FOR RECONSIDERATION OF ORDER GRANTING SUMMARY JUDGMENT IN DEFENDANT'S FAVOR ON CLAIMS OF GENDER DISCRIMINATION** |
| v. | |
| CITY AND COUNTY OF SAN FRANCISCO, | |
| Defendant. | |

Now before the Court is plaintiffs' motion for reconsideration of the Court's February 17, 2010 order granting defendant's motion for summary judgment and denying plaintiffs' motion for summary judgment on plaintiffs' claims of gender discrimination. Having considered the papers submitted, and for good cause shown, the Court hereby DENIES plaintiffs' motion for reconsideration.

**BACKGROUND**

Plaintiffs in this action are a group of male and female sheriff's deputies employed by the San Francisco Sheriff's Department. Plaintiffs filed this action on July 13, 2007, shortly after the Sheriff instituted a policy of placing only female deputies in the female inmate housing units of County Jail #8 ("CJ8"), alleging that the new staffing policy ("the Policy") constituted gender discrimination in violation of Title VII and the California Fair Employment and Housing Act ("FEHA").[1]

On February 17, 2010, the Court granted summary judgment in defendant's favor on the gender discrimination claims. *See* Feb. 17 Order at *13-14 (Docket No. 272). The factual background

---

[1] Some of the plaintiffs also stated claims for retaliation. Those claims are not at issue in the present motion.

1 underlying the development and implementation of the Policy, as well as a description of each of
2 plaintiffs' claims, is contained in the Order and is incorporated here by reference. The Court's summary
3 judgment ruling was based on its finding that defendant had met its burden of proof with respect to each
4 element of the bona fide occupational qualification ("BFOQ") defense to plaintiffs' Title VII and FEHA
5 employment discrimination claims.[2]  *Id.* at *13.

6 Thereafter, the Ninth Circuit issued a published decision in *Breiner v. Nev. Dep't of Corr.*, No.
7 09-15568, slip op. at 9675 (9th Cir. July 8, 2010), reversing a district court's grant of summary judgment
8 to an employer in a case involving a gender-based prison staffing policy, finding that gender was not
9 a BFOQ for the positions at issue and that the gender-based policy had more than a de minimis impact
10 on the plaintiffs' employment opportunities. Plaintiffs have now moved for reconsideration of the
11 Court's grant of summary judgment to defendant in light of the *Breiner* decision.

**DISCUSSION**

14 In this motion for reconsideration, plaintiffs argue that, pursuant to the standards set forth in
15 *Breiner*, they are entitled to summary judgment on their gender discrimination claims because defendant
16 cannot prove that gender was a BFOQ for the positions in question or that the Policy had only a de
17 minimis impact on plaintiffs' employment opportunities. As stated above, the Court previously focused
18 on the BFOQ defense in granting summary judgment to defendant. Because the Court finds that the
19 BFOQ defense continues to apply, the Court does not reach the issue of whether defendant has proven,
20 under the standards set forth in *Breiner*, that the Policy at issue in this case had no more than a de
21 minimis impact on plaintiffs' employment opportunities.

### I. Elements of the BFOQ Defense

24 Under Title VII and FEHA, it is unlawful for an employer to discriminate on the basis of sex

---

[2] Defendant also moved for summary judgment on the ground that the Policy had only a de minimis impact on plaintiffs' employment opportunities. The Court did not decide this issue because it granted summary judgment based on the BFOQ defense. The Court observed, however, that defendant had raised "some persuasive arguments regarding the de minimis nature of many of the harms alleged in this case." Feb. 17 Order at *14.

2

with respect to an employee's compensation or in the terms, conditions, or privileges of employment, or to "limit, segregate, or classify" on the basis of sex in any way that deprives an employee of employment opportunities or adversely affects his or her employment status. 42 U.S.C. § 2000e-2(a)(1) & (2); Cal. Gov. Code § 12940(a). A statutory defense to liability exists under both Title VII and FEHA, however, when an employee's sex qualifies as a BFOQ that is "reasonably necessary to the normal operation of that particular business or enterprise." 42 U.S.C. § 2000e-2(e); Cal. Gov. Code § 12940.

"As its language indicates, the BFOQ is an extremely narrow exception to the general prohibition of discrimination on the basis of sex that may be invoked only when the *essence* of the business operation would be undermined by hiring individuals of both sexes." *Breiner*, No. 09-15568, slip op. at 9685 (original emphasis) (quotation marks and citations omitted); *see also Dothard v. Rawlinson*, 433 U.S. 321, 333 (1977). In the correctional context, the "essence" of the business includes "the security of the prison, the safety of inmates, and the protection of the privacy rights of inmates." *Everson v. Mich. Dep't of Corr.*, 391 F.3d 737, 753 (6th Cir. 2004). The employer must also demonstrate that the qualification is directly related to an employee's ability to do the job and is reasonably necessary – not "merely reasonable or convenient" – to ensure continued operation of the business. *Id.* at 748. The employer may prove reasonable necessity by showing "that sex is a legitimate proxy for the qualification because (a) it has a substantial basis for believing that all or nearly all men lack the qualification, or (b) it is impossible or highly impractical to insure by individual testing that its employees will have the necessary qualifications for the job." *Breiner*, No. 09-15568, slip op. at 9685 (citation and alterations omitted). Finally, the employer must show that its interests could not have been achieved through a viable non-discriminatory alternative. *Everson*, 391 F.3d at 749; *Robino v. Iranon*, 145 F.3d 1109, 1111 (9th Cir. 1998).

## II. Background on *Breiner*

The plaintiffs in *Breiner* were four male correctional officers employed by the Nevada Department of Corrections ("NDOC"). NDOC learned in 2003 that an inmate at the Southern Nevada Women's Correctional Facility ("SNWCF") had become pregnant as a result of a sexual encounter with

3

a male guard. *Breiner*, No. 09-15568, slip op. at 9676. The incident spurred an investigation into conditions at SNWCF, and NDOC learned that, as a result of lax management by the Corrections Corporation of America ("CCA"), the private corporation running the facility under contract with NDOC, the facility was plagued by sexual and other improper relationships between female inmates and male front-line prison staff. *Id.* These revelations led NDOC to terminate its contract with CCA and resume direct control of the facility. At that time, NDOC also implemented two gender-based staffing policies, which required (1) that seventy percent of the front-line prison guard positions must be filled by women, and (2) that SNWCF's three correctional lieutenant supervisor positions must be filled by women. *Id.* at 9676-77.

In their lawsuit against NDOC, the plaintiffs challenged only the second of the two staffing policies listed above, alleging that the restriction on the correctional lieutenant positions unlawfully limited their employment and promotional opportunities on the basis of their gender. *Id.* at 9677. NDOC moved for summary judgment and the district court granted the motion, finding both that the gender limitation had only a de minimis impact and that NDOC had carried its burden of proving that gender constituted a BFOQ for the correctional lieutenant positions. The Ninth Circuit reversed on both grounds. *Id.* at 9696-97. In finding that NDOC had failed to prove that gender was a BFOQ for the correctional lieutenant positions, the Ninth Circuit rejected each of the three justifications advanced by NDOC: (1) that male correctional lieutenants were more likely to condone sexual abuse by inferior officers; (2) that male lieutenants were themselves likely to sexually abuse female inmates; and (3) that female lieutenants had "an innate ability to manage women [and] understand some of the emotional outbreaks" and were "more patient [and] . . . more maternal." *Id.* at 9686-88.

First, with respect to leadership, the Ninth Circuit pointed out that NDOC had resumed control of the facility precisely as a result of prior mismanagement, and could not simply presume from the leadership problems present under CCA that all male supervisors would turn a blind eye to sexual abuse of female inmates by their subordinates. *Id.* at 9692, 9694. Second, the court held that NDOC could not support the discriminatory policy by citing the potential for sexual abuse of female inmates by male lieutenants themselves, absent any evidence of even a single such incident. The court noted that although there was at least one documented incidence of abuse by a male guard, NDOC left a significant

4

1 percentage of the front-line positions open to males. *Id.* at 9692-93. Third, the Ninth Circuit rejected
2 NDOC's attempt to justify the discriminatory policy with "specious gender stereotypes" regarding
3 women's superior ability to understand and manage female inmates. *Id.* as 9695. In holding that NDOC
4 had failed to establish that gender was a BFOQ for the correctional lieutenant positions, the court also
5 noted that NDOC had failed to refute the viability of any non-discriminatory alternatives for achieving
6 its goals. *Id.* at 9694-96.

7 The Court finds that the facts of the *Breiner* case are distinguishable from the facts of this case
8 in several key respects. First, the staffing decision in *Breiner* was implemented immediately after a
9 management shift which was carried out precisely in order to address pervasive mismanagement issues,
10 before the positive effects of the management change had been felt, and without adequate consideration
11 of any non-discriminatory alternatives. By contrast, this case involves a continuity of management and
12 a staffing policy that was developed and implemented by correctional officials well-acquainted with the
13 facility at issue and with potential alternative approaches. Second, *Breiner* involved a gender restriction
14 on hiring for supervisory positions, while this case involves a restriction on hiring for front-line guards
15 who are in direct contact with female inmates. Third, the correctional officials in *Breiner* relied largely
16 on gender stereotypes and unproven gender-based assumptions, while the officials who implemented
17 the policy at issue in this case relied on the actual history of misconduct in the San Francisco jails. In
18 light of these important distinctions, the Court finds that *Breiner* does not warrant reconsideration of
19 the Court's order granting summary judgment in defendant's favor.

### III. Application of BFOQ Defense

#### A. Essence of the Business

23 In its order granting summary judgment to defendant, the Court first found that defendant had
24 proved that the Policy was implemented in order to protect essential correctional interests, including the
25 safety, security, privacy, and rehabilitation of female inmates and the maintenance of efficiency and
26 morale among deputies. *See* Feb. 17, 2010 Order at *5-7. With respect to inmate protection concerns,
27 the Court cited the history of sexual misconduct and other inappropriate relationships between male
28 deputies and female inmates, which included two civil rights lawsuits brought by female inmates as well

5

as twelve inmate complaints during the five years preceding the implementation of the Policy, some of which resulted in deputies resigning or being disciplined, and one of which was referred to the District Attorney for prosecution. *Id.* at *5-6 (citing Flewellen Decl. ¶ 16; Hennessey Decl. ¶ 9; Ofierski Decl. Ex. A & B). The Court also observed that the Policy aided in protecting female inmates' privacy interests by ensuring that male deputies could not view them while they were showering, using the toilet, or changing clothes, an issue of particular concern due to the circular structure of CJ8. *Id.* at *7 (citing Dempsey Decl. ¶¶ 12, 27). With respect to maintenance of deputy morale and efficiency, the Court cited evidence that male deputies' reluctance to supervise female inmates closely due to a fear of false misconduct allegations had led to increased possession of contraband by female inmates, and to resentment among female deputies who were forced to shoulder a heavier workload. *Id.* at *6 (citing Hennessey Decl. ¶ 12; Dempsey Decl. ¶¶ 22-23).

These justifications continue to meet defendant's burden of proving that the Policy was designed to protect interests that go to the essence of the Sheriff's business. The record does not support plaintiffs' assertion that the Policy was developed simply because the Sheriff believed that "all men are predatory and cannot be trusted with female inmates." Rather, as described above, defendant presented evidence demonstrating that the Policy was designed to address fundamental and ongoing problems in the San Francisco jails.[3] This evidence distinguishes this case from *Breiner*, in which there was no evidence that NDOC's discriminatory policy aided it in protecting any of the essential interests claimed by NDOC officials.

### B.  Reasonable Necessity

In its summary judgment order, the Court also found that defendant had proved that the Policy

---

[3] Plaintiffs find fault with the Policy because it does not focus on other forms of "statistically" likely sexual conduct, such as "male guard and male inmate, female guard and female inmate, and female guard and male inmate." However, plaintiffs provides no evidence that these potential forms of violations ever occurred or were a serious problem in the San Francisco jails. The Undersheriff could not recall any instance where the Department sustained an allegation of same-sex sexual misconduct, nor any complaints by male inmates against female deputies. Dempsey Decl. ¶ 24. While the possibilities outlined by plaintiffs might be of academic interest, the Sheriff and his staff were charged with the management of a real-world facility that faced concrete problems. The Sheriff cannot be expected to prioritize non-existent issues in formulating his policies.

was reasonably necessary to ensure the continued operation of the jails and to address the specific problems identified by the Sheriff. Feb. 17, 2010 Order at *11-12. The Court noted first that the Policy was directly aimed at solving the potential problems created by the circular, "direct supervision" structure of the female housing units. *Id.* at *11. The Court also cited the security concerns associated with male deputies' fear of false misconduct allegations and their resulting reluctance to supervise female inmates closely and thoroughly. *Id.* at *11-12.

*Breiner* requires correctional officials "to identify a concrete, logical basis for concluding that gender restrictions are 'reasonably necessary.'" *Breiner*, No. 09-15568, slip op. at 9690. "[E]ven in the unique context of prison employment, administrators seeking to justify a BFOQ must show a high correlation between sex and ability to perform job functions." *Id.* at 9691 (quotation marks and citation omitted). In *Breiner*, the Ninth Circuit found that there was no such correlation where NDOC's argument was essentially "that because the supervisors employed by CCA were male and had failed to prevent sexual abuse, NDOC was entitled to conclude that men as a class were incapable of adequately supervising front line staff in female prisons." *Id.* at 9692. The Court found that CCA's prior mismanagement did not give NDOC the unchecked ability to experiment with discriminatory staffing policies, absent any evidence that the past problems were likely to continue and that gender restrictions were necessary to curb these problems. *Id.* The Ninth Circuit also found that NDOC could not show a "high correlation" between sex and the ability to perform the correctional lieutenant position by relying on gender-based stereotypes. *Id.* at 9688, 9695.

Unlike the policy rejected in *Breiner*, the Policy at issue in this case is devoid of baseless assumptions regarding the recurrence of past problems and of reliance on stereotypes of male or female behavior. The Sheriff did not attempt to defend the Policy by simply arguing that all male deputies were likely to sexually abuse female inmates. Rather, the Sheriff cited concrete examples of the security, privacy, and morale concerns created by male deputies' presence within CJ8. With respect to inmate security and safety, the Court has already pointed to evidence of the numerous complaints and incidents of sexual misconduct by male deputies which occurred within the five years prior to the implementation of the Policy. The Sheriff made multiple attempts to resolve these problems – including through investigation, discipline, termination, and criminal referral – before formulating the Policy. With

respect to privacy, Undersheriff Dempsey noted that Sheriff's Department policy requires male deputies to announce their presence before entering a female housing unit, while female deputies face no such restriction. Dempsey Decl. ¶ 25. Undersheriff Dempsey stated that female deputies therefore "have additional opportunities to observe behavior that inmates attempt to hide, which increases safety for everybody." *Id.* Finally, with respect to deputy morale, defendant presented evidence that female deputies were unwilling to report their male colleagues for the poor performance occasioned by their reluctance to work closely with female inmates. Dempsey Depo., Murray Decl. Ex. F, at 192:5-7.

These practical considerations distinguish the Policy at issue in this case from the poorly-reasoned policy rejected by the Ninth Circuit in *Breiner*.

### C. Consideration of Alternatives

In granting summary judgment in favor of defendant, the Court found that the Sheriff had considered and rejected three non-discriminatory alternatives before enacting the Policy. First, the Sheriff concluded that there was no reliable method of testing or screening male deputies to discover those who might engage in sexual misconduct. Second, the Sheriff determined that installing additional security cameras would be cost-prohibitive. Third, the Sheriff determined that additional training would be ineffective, as all deputies were already taught that personal relationships of any kind between deputies and inmates were forbidden. Feb. 17, 2010 Order at *12 (citing Hennessey Decl. ¶ 16). The Court found that each of the other alternatives suggested by plaintiffs – namely requiring further training, installing rotating cameras to provide more coverage of the female pods, and installing improved cell doors and inmate restraints – would not address the problems targeted by the Policy. *Id.* at *12-13. The Court noted in particular that plaintiffs' own expert testified at his deposition that additional training would "not prevent and not discourage all staff from engaging in sexual misconduct." *Id.* at *13 (citing Marquart Depo., Ofierski Decl. Ex. FF, at 90:6-9).

In *Breiner*, the Ninth Circuit found that NDOC had failed to show that it considered any alternative, non-discriminatory measures before placing the gender restriction on its correctional lieutenant positions. The court stressed that NDOC could not be absolved of the fundamental responsibility to supervise its staff and listed the multiple resources that could be deployed to control

8

employee behavior, including "background checks, prompt investigation of suspected misconduct, . . . . severe discipline for infractions," and training. *Breiner*, No. 09-15568, slip op. at 9694. Unfortunately, in this case, many of these measures have already been deployed by the Sheriff with little success, or the Sheriff has advanced cogent arguments explaining why they will be ineffective. Thus, there is no basis for plaintiffs' contention that the Sheriff made no effort to identify alternative measures before implementing the Policy. Additionally, as discussed below, the Sheriff's extensive experience in running the female housing units in the San Francisco jails lends credence to his evaluation of reasonable alternatives. By contrast, in *Breiner*, NDOC lacked a history of operating SNWCF, and under CCA, there was virtually no record of investigation and discipline of employee misconduct.

### D. Deference

The Court previously found that the Sheriff's policy decisions were entitled to "some deference" based on the Sheriff's and Undersheriff's significant expertise and their consultation with senior staff. Feb. 17, 2010 Order at *9-10. The Court emphasized that the Court is "not charged with determining whether the Policy was the *best* means of addressing the problems the Sheriff and Undersheriff were seeking to remedy," but rather with "determining whether the Sheriff's actions were lawful." *Id.* at *10 (original emphasis). In *Breiner*, the illogical nature of NDOC's policy, the lack of any direct management history of SNWCF, and the speculative and stereotyped assumptions that pervaded the policy made it all but impossible for the Ninth Circuit to defer to NDOC's judgment. *Breiner*, No. 09-15568, slip op. at 9692-95. In the present case, by contrast, the Sheriff based the Policy on the practical considerations discussed above, and after months of deliberations with the Undersheriff and other senior staff. As stated in the summary judgment order, the Court is unwilling to substitute its judgment for that of these professional administrators.

In view of the deference due to the Sheriff's policy decision, the evidence showing that the restrictions set forth in the Policy were reasonably necessary to carry out essential correctional interests, and the lack of viable non-discriminatory alternatives, the Court must conclude that reconsideration of the grant of summary judgment in defendant's favor is not warranted.

9

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby DENIES plaintiffs' motion for reconsideration of the Court's prior grant of summary judgment to the defendant. (Docket No. 301).

**IT IS SO ORDERED.**

Dated: August 25, 2010

SUSAN ILLSTON
United States District Judge